UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CHRISTINA R.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:18-cv-03370-MJD-SEB |
| | ) |
| ANDREW M. SAUL, Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

**ENTRY REVIEWING THE COMMISSIONER'S DECISION**

Claimant Christina R. applied for disability insurance benefits ("DIB") from the Social Security Administration ("SSA") on October 29, 2014, alleging an onset date of June 18, 2014. [Dkt. 7-2 at 19.] Her application was initially denied on December 23, 2014, [Dkt. 7-4 at 2], and upon reconsideration on March 30, 2015, [Dkt. 7-4 at 8]. Administrative Law Judge Blanca B. de la Torre (the "ALJ") conducted a hearing on March 24, 2017, [Dkt. 7-2 at 41-65], and held a supplemental hearing on July 14, 2017, [Dkt. 7-2 at 68-112]. The ALJ issued a decision on August 28, 2017, concluding that Claimant was not entitled to receive benefits. [Dkt. 7-2 at 16-32.] The Appeals Council denied review on August 29, 2018. [Dkt. 7-2 at 2.] On November 1,

---

[1] To protect the privacy interests of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

2018, Claimant timely filed this civil action asking the Court to review the denial of benefits according to 42 U.S.C. § 405(g). [Dkt. 1.]

## I. STANDARD OF REVIEW

"The Social Security Act authorizes payment of disability insurance benefits . . . to individuals with disabilities." *Barnhart v. Walton*, 535 U.S. 212, 214 (2002). "The statutory definition of 'disability' has two parts. First, it requires a certain kind of inability, namely, an inability to engage in any substantial gainful activity. Second, it requires an impairment, namely, a physical or mental impairment, which provides reason for the inability. The statute adds that the impairment must be one that has lasted or can be expected to last . . .not less than 12 months." *Id.* at 217.

When an applicant appeals an adverse benefits decision, this Court's role is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's decision. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citation omitted). For the purpose of judicial review, "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). Because the ALJ "is in the best position to determine the credibility of witnesses," *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008), this Court must accord the ALJ's credibility determination "considerable deference," overturning it only if it is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quotations omitted).

The ALJ must apply the five-step inquiry set forth in 20 C.F.R. § 404.1520(a)(4)(i)-(v), evaluating the following, in sequence:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can

perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (citations omitted) (alterations in original). "If a claimant satisfies steps one, two, and three, she will automatically be found disabled. If a claimant satisfies steps one and two, but not three, then she must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy." *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

After Step Three, but before Step Four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). In doing so, the ALJ "may not dismiss a line of evidence contrary to the ruling." *Id.* The ALJ uses the RFC at Step Four to determine whether the claimant can perform her own past relevant work and if not, at Step Five to determine whether the claimant can perform other work. *See* 20 C.F.R. § 404.1520(iv), (v).] The burden of proof is on the claimant for Steps One through Four; only at Step Five does the burden shift to the Commissioner. *See Clifford*, 227 F.3d at 868.

If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits. *Barnett*, 381 F.3d at 668. When an ALJ's decision is not supported by substantial evidence, a remand for further proceedings is typically the appropriate remedy. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005). An award of benefits "is appropriate only where all factual issues have been resolved and the record can yield but one supportable conclusion." *Id.* (citation omitted).

## II. BACKGROUND

Claimant was 34 years of age at the time she alleged her disability began. [Dkt. 7-6 at 2.] She has completed high school, with a history of special education, and previously worked as an administrative assistant and in child services. [Dkt. 7-7 at 6.][2]

The ALJ followed the five-step sequential evaluation set forth by the Social Security Administration in 20 C.F.R. § 404.1520(a)(4) and ultimately concluded that Claimant was not disabled. [Dkt. 7-2 at 31.] Specifically, the ALJ found as follows:

- At Step One, Claimant had not engaged in substantial gainful activity[3] since June 18, 2014, the alleged onset date. [Dkt. 7-2 at 21.]

- At Step Two, she had the following severe impairments: obesity, residual effects of bariatric surgery, peripheral neuropathy "due to B12 deficiency," Hashimoto's thyroiditis, degenerative disc disease of the lumbosacral spine, depression, anxiety, and "somatization disorder." [Dkt. 7-2 at 22.]

- At Step Three, Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. [Dkt. 7-2 at 22.]

- After Step Three but before Step Four, she had the RFC "to perform light work as defined in 20 CFR 404.1567(b)1 except: She is able to lift, carry, push or pull twenty pounds occasionally and ten pounds frequently. With customary breaks in the morning, at lunch and in the afternoon, she is able to sit for at least six hours during a typical workday. She is able to stand and/or walk for one hour at a time and for four hours during the workday. She is not able to climb ladders, ropes or scaffolds, but she is able to climb ramps and stairs occasionally. She is able to balance, stoop and crouch occasionally, but cannot kneel or crawl. She is able to handle, finger or feel objects bilaterally on a frequent basis, and is able to reach bilaterally in all directions on a constant basis. She cannot tolerate exposure to extreme heat, extreme cold, wetness, industrial vibrations, unprotected heights, or dangerous, moving machinery. She cannot work on wet, slippery uneven surfaces. She cannot work with strobe/flashing lights in the immediate work area. She cannot work in proximity to open bodies of water or fires.

---

[2] The relevant evidence of record is amply set forth in the parties' briefs and need not be repeated here. Specific facts relevant to the Court's disposition of this case are discussed below.

[3] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 404.1572(a).

She is unable to perform work that involves walking on wet, slippery or uneven surfaces. She cannot engage in commercial driving.

The claimant has no restriction in the ability to understand, remember and carry out instructions, except for those that are detailed or complex. She can sustain attention and concentration for 2-hour periods at a time and for 8 hours in the workday on all types of tasks except those that are detailed or complex. She has the ability to use judgment in making work-related decisions commensurate with the type of work described above. She requires an occupation with only occasional contact with supervisors and co-workers, and only occasional contact with the public on routine matters." [Dkt. 7-2 at 25-26.]

- At Step Four, relying on the testimony of the vocational expert ("VE") considering Claimant's RFC, she was incapable of performing any of her past relevant work as an administrative assistant or her composite jobs that most closely resembled the combined occupations of an inventory clerk, volunteer coordinator, and childcare attendant. [Dkt. 7-2 at 30.]

- At Step Five, relying on VE testimony considering Claimant's age, education, and RFC, there were jobs that existed in significant numbers in the national economy that she could have performed through the date of the decision in representative occupations, such as an office helper, mail clerk, and photocopying machine operator. [Dkt. 7-2 at 30-31.]

## III. DISCUSSION

Claimant contends that the ALJ erred in relying heavily on the testimony and opinion of the psychological medical expert at both Step Three and in assessing Claimant's RFC. The Court will address the arguments in turn.

**A. Step Three**

At the supplemental hearing, the ALJ called licensed, clinical psychologist James Brooks, Ph.D., to testify as a medical expert based on his review of the complete medical record. [*See* Dkt. 7-2 at 85; Dkt. 7-23 at 57 (Dr. Brooks's professional qualifications).] The ALJ noted that Dr. Brooks was also able to listen to Claimant's testimony during the supplemental hearing. [Dkt. 7-2 at 24.] The ALJ summarized Dr. Brooks's testimony, including that he had "noted that the reports from [treating neuropsychologist C.B. Johnson, Ph.D.] indicate[d] a primary diagnosis of a conversion disorder." [Dkt. 7-2 at 23-24.] At Step Three, the ALJ concluded that

5

Listings 12.04, 12.06, and 12.07 were not met or equaled and she explained, "In reaching this conclusion, I am giving great weight and adopting, Dr. Brooks'[s] opinion." [Dkt. 7-2 at 24.]

Claimant takes issue with Dr. Brooks's testimony, arguing that he improperly opined that Listing 12.07 was a subcategory of Listing 12.08 for personality disorders. [Dkt. 16 at 8.] Listing 12.07 for "[s]omatic symptom and related disorders" are disorders "characterized by physical symptoms or deficits that are not intentionally produced or feigned, and that, following clinical investigation, cannot be fully explained by a general medical condition, another mental disorder, the direct effects of a substance, or a culturally sanctioned behavior or experience." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(B)(6)(a). Relevant to this case, "symptoms and signs" of such disorders may include "pseudoseizures." *Id*. The regulation specifies that "[e]xamples of disorders that [the SSA] evaluate[s] in this category include . . . conversion disorder." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00(B)(6)(b). Dr. Brooks testified that Claimant's impairment should "be evaluated under 12.07, the listing for somatoform disorder . . . [because of] the presence of what are called psychogenic seizures." [Dkt. 7-2 at 89.] As noted above, the ALJ found somatization disorder to be a severe impairment and explicitly concluded that Listing 12.07 was not met or equaled. She did not explicitly consider Listing 12.08 in the decision. It can be implied from the ALJ's analysis that she concluded that Claimant had a severe, medically determinable impairment that qualified under the diagnostic criteria of Listing 12.07—more precisely labelled conversion disorder in this instance rather than somatization disorder or somatoform disorder—but that the evidence did not demonstrate the degree of functional limitation required by the listing.

Mental impairments are evaluated by the SSA with use of a "special technique" that involves rating the degree of limitation— according to a five point scale either none, mild,

6

moderate, marked, or extreme—in four broad functional areas: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. 20 C.F.R. § 404.1520a(b)-(c). Dr. Brooks assessed that Claimant had moderate impairment in (2) and (4) and mild impairment in (1) and (3) respectively. [Dkt. 7-2 at 90.] Once the respective diagnostic criteria are established, both Listings 12.07 and 12.08—as is generally the case with all the mental health listings—require either a marked degree of limitation in two of the broad functional areas or an extreme degree of limitation in one such area. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.07; *Id.* at 12.08. The SSA does not rate the degree of limitation for each separate mental impairment, but rather rates the degree of limitation for the collective "impairment(s)" that can be established as "medically determinable." *See* 20 C.F.R. § 404.1520a(b). Some mental health listings can be established in the alternative by specific criteria listed under paragraph C of the listing. *See, e.g.*, 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.06. However, neither Listings 12.07 or 12.08 include an alternative paragraph C criterion. As such, there is no substantive difference in this instance as to which of the listings were evaluated; the ALJ's adoption of Dr. Brooks's assessment did not result in the requirements of either listing being satisfied.

Claimant has not presented any argument on appeal that her degree of limitation met or equaled the requirements of a listing, inclusive of Listing 12.07. To demonstrate that an ALJ's listing conclusion was not supported by substantial evidence, the claimant must identify evidence of record that was misstated or ignored which met or equaled the criteria. *See, e.g.*, *Sims v. Barnhart*, 309 F.3d 424, 429-30 (7th Cir. 2002). Claimant also did not produce any medical opinion in support of her claim that specifically opined that the requirements of any listing were satisfied. The Seventh Circuit has held that "[t]he ALJ may properly rely upon the opinion of …

7

medical experts," as substantial evidence that no listing was met or equaled. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (citing *Scott v. Sullivan*, 898 F.2d 519, 524 (7th Cir. 1990); *Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1989)). In *Scheck*, the Seventh Circuit discussed the ALJ's "duty to 'minimally articulate his or her justification for rejecting or accepting specific evidence of disability,'" and found the absence of any contrary, supportive opinion a relevant factor in assessing whether the ALJ's listing conclusions were supported by substantial evidence. 357 F.3d at 700 (quoting *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988) (internal citations removed)). Accordingly, the Court finds that substantial evidence supports the ALJ's listing conclusion.

Claimant also argues that Dr. Brooks's testimony amounted to a reorganization of the listing regulations and the ALJ erred as a matter of law by relying on that testimony. [Dkt. 16 at 11.] Claimant's argument is based on a portion of Dr. Brooks's testimony, where he explained:

> The reason I put two and four [referring to the broad functional areas detailed above] at moderate is 12.07, the somatoform disorder, is—I think it's really useful to think of that as kind of a subcategory of 12.08.
>
> 12.08 are the personality factors and by definition those are learned behaviors. And psychogenic seizures, there's a lot of different opinions about this. But I think the prevalent view, particularly among psychologists is that these—they're not biologically determined.
>
> They're not the result of impaired neurology, whatever. They are learned behavior. Therefore like all the other personality issues, you know, there's a factor of where there can be relearning, either through treatment or other reasons, whatever.
>
> But I think they would impose at least a moderate level of limitation on relationships and the ability to adapt like [sic] in a work setting. That's why I put those at the moderate level. This would require a mental residual functional capacity[.]

[Dkt. 7-2 at 90-91.] Dr. Brooks used an analogy to personality disorders to describe his professional opinion that psychogenic seizures are amenable to treatment. The implications of

8

that analogy did not alter the listing requirements themselves in any substantive way. Dr. Brooks assessed the degree of the functional limitation in the broad functional areas and the ALJ properly analyzed the listings utilizing the correct regulatory requirements. As such, the Court does not find legal error at Step Three.

Although it is unclear how Dr. Brooks's professional opinion that Claimant's conversion disorder—characterized by symptoms of psychogenic seizures—being amenable to treatment was relevant to an assessment of the degree of limitation that the disorder imposed, as explained above, Claimant has not argued that a greater degree of limitation in any of the broad functional areas was established by the record. And there was no relevant medical opinion that conflicted with Dr. Brooks's listing assessment. However, as the Court will explain, the ALJ's adoption of Dr. Brooks's opinion in its entirety is problematic when it comes to the ALJ's RFC finding.

**B. RFC**

The record included several opinions from treating sources who assessed limitations in conflict with the ALJ's RFC finding. Social Security Ruling ("SSR") 96-8 requires that the "RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p (S.S.A. July 2, 1996), 1996 WL 374184 at *7. "Social Security Rulings are binding on all components of the Social Security Administration." 20 C.F.R. § 402.35(b)(1).

The ALJ's decision did not address the medical source statement cosigned by a treating nurse practitioner, Jennifer Sorg, P.M.H.N.P., and a supervising physician, Gina Laite, M.D. [*See* Dkt. 7-22 at 68-72 (medical source statement); *see also* Dkt. 7-2 at 93-94 (hearing transcript discussing Dr. Laite's identity).] The medical source statement included assessments that

9

Claimant would have "sometimes" needed to take unscheduled breaks, multiple times per hour during a working day based on her anxiety symptoms, she would have been off-task as much as seventy-five percent of a typical workday, she would be incapable of even low stress work, and she would likely have been absent from work more than four days per month. [Dkt. 7-22 at 69-71.] A narrative explained, "[Patient] reports that due to depression/low motivation [and] anxiety, it would be hard for her to stay on task/schedule and to be able to be productive without interruption of symptoms which would require her to take breaks [and] have low concentration." [Dkt. 7-22 at 71.] Ms. Sorg's treatment notes indicate that she was familiar with Claimant's reported symptoms, including one such example:

> [Patient] reports she's keeping a "seizure log." Having seizures as much as 4x per day to 1-2 per week. Reports symptoms include-internal heat, confusion, lasting 30-40 seconds to 1 minute, tense muscles. Partner says she has shallow breaths, feels like an elephant is on her chest. Reports needing inhaler/breathing treatment after episode. Reports "I've lost hours of time after one of those."

[Dkt. 7-22 at 34.] The ALJ's failure to address this medical source statement is reversable error.

The ALJ did address the medical source statement provided by Claimant's primary care physician, Jeffrey Meglin, M.D. [Dkt. 7-2 at 28-29.] Dr. Meglin's assessment included that Claimant would have sometimes needed unscheduled breaks multiple times per week that could last all day and that she would be capable of low stress work, but "may be incapable at times." [Dkt. 7-24 at 6-8.] Dr. Meglin indicated that psychological conditions effected Claimant's physical conditions, including depression, anxiety, and "possible" somatoform disorder. [Dkt. 7-24 at 6.] The ALJ explained that Dr. Meglin's "conclusions [were] based on the claimant's subjective symptoms and not on the overall record and clinical findings." [Dkt. 7-2 at 29.] The ALJ also noted that the opinion conflicted with the state agency reviewing opinion and the opinion of Dr. Brooks. [Dkt. 7-2 at 29.]

10

When a treating opinion is contradicted by other substantial evidence, such that controlling weight is not appropriate, the ALJ is still "required to determine what value the assessment did merit." *Scott v. Astrue*, 647 F.3d 734, 739-40 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(c)(2); *Larson v. Astrue,* 615 F.3d 744, 751 (7th Cir. 2010)). The Seventh Circuit has explained that "[i]f an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Scott*, 647 F.3d at 740 (citing *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009)); *see* 20 C.F.R. § 404.1527(c).

When it comes to mental health impairments, an ALJ may not discount a medical opinion simply because it is based on the claimant's subjective reports. *See Adaire v. Colvin*, 778 F.3d 685, 688 (7th Cir. 2015). The Seventh Circuit has explained that "all findings in psychiatric notes must be considered, even if they were based on the patient's own account of her mental symptoms." *Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir. 2018) (citing *Price v. Colvin*, 794 F.3d 836, 839-40 (7th Cir. 2015); *Adaire*, 778 F.3d at 688). Even though Dr. Meglin is a primary care physician rather than a mental health specialist, his treatment records consistently listed anxiety and depression as the reason for Claimant's visit. [*See, e.g.*, Dkt. 7-22 at 42.]

Moreover, Dr. Meglin and his staff were not only aware of Claimant's subjective reports, they also recorded their personal observations of her presentation. The Seventh Circuit has explained that an "ALJ is required to consider findings that support a treating doctor's opinion; failure to do so is error." *Hardy v. Berryhill*, 908 F.3d 309, 312-13 (7th Cir. 2018) (citing *Lambert v. Berryhill*, 896 F.3d 768, 775 (7th Cir. 2018); *Gerstner*, 879 F.3d at 262-63). The ALJ's written decision did not confront relevant observations that Claimant had a somber mood,

tired or fatigued affect, and appeared overwhelmed on more than one visit. [Dkt. 7-22 at 42; Dkt. 7-22 at 44.] Further consideration of Dr. Meglin's opinion in accord with the authorities cited above is necessary.

Having concluded that remand is necessary for further consideration of the treating opinions detailed above, the Court continues in the interest of offering guidance on remand concerning the ALJ's need to reevaluate Claimant's RFC, weigh the opinion evidence, and evaluate Claimant's credibility. "The regulations require that an ALJ's RFC be based on the entire case record, including the objective medical findings and the credibility of the claimant's subjective complaints." *Poppa v. Astrue*, 569 F.3d 1167, 1170-71 (10th Cir. 2009) (citations omitted); *see* 20 C.F.R. § 404.1529; 20 C.F.R. § 404.1545. "Since the purpose of the credibility evaluation is to help the ALJ assess a claimant's RFC, the ALJ's credibility and RFC determinations are inherently intertwined." *Poppa*, 569 F.3d at 1171; *see Outlaw v. Astrue*, 412 F. App'x 894, 897 (7th Cir. 2011) ("RFC determinations are inherently intertwined with matters of credibility, and we generally defer to an ALJ's credibility finding unless it is 'patently wrong.'") (quoting *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)).

The ALJ misstated record evidence that is both relevant to an evaluation of Claimant's symptoms and supportive of the treating opinions detailed above. The ALJ explained:

> I have noted the Neuro-vocational Evaluation conducted on December 30, 2015 indicting that the claimant performed poorly on psychometric testing and that she exhibited possible symptom magnification (Ex. 32F). While the later evidence does indicate presence of a somatization disorder rather than malingering, the possible cognitive limitations are not consistent with the other evidence in the record, especially the opinion of the independent medical expert.

[Dkt. 7-2 at 28.] The assessing clinician concluded:

> On formal evaluation of her psychological status, [Claimant] produced a profile consistent with a major depression with recurrent and severe, without psychotic features and a generalized anxiety disorder. The evaluation was also consistent

12

with a somatization disorder. [Claimant] is very likely inclined toward self-blame and self-punishment and there is a propensity to downgrade herself and anticipate rejection.

[Dkt. 7-23 at 10.] The clinician also noted that Claimant "was anxious and this certainly interfered with her performance [on the testing] at times." [Dkt. 7-23 at 10.] Contrary to the ALJ's summary, the report noted that Claimant "was given several measures of possible symptom magnification, all of which were within normal limits." [Dkt. 7-23 at 10.] The clinician concluded that Claimant's "effort was good and a reliable determination of her cognitive status was obtained." [Dkt. 7-23 at 10.]

Returning to Dr. Brooks's opinion that Claimant's conversion disorder may be amenable to treatment, the implications of Dr. Brooks's testimony is problematic in this case. The opinion is partly a medical opinion and partly a legal determination. The Seventh Circuit has explained that "the ALJ cannot delegate to any doctor, and certainly not to a non-examining doctor, the task of evaluating the claimant's credibility." *Plessinger v. Berryhill*, 900 F.3d 909, 915 (7th Cir. 2018). In *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006), a treating physician "was of the opinion that Prochaska's mental condition was treatable and under control, and [the Seventh Circuit explained that] controllable conditions do 'not entitle one to benefits or boost one's entitlement by aggravating another medical condition.'" *Id.* (quoting *Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004). However, the court did not just rely on the claimant having a treatable condition, but detailed that the treating physician "repeatedly reported that her psychiatric state was stable and controlled." *Prochaska*, 454 F.3d at 737. Here, Dr. Brooks did not offer any testimony that the record reflected control of Claimant's symptoms, including her psychogenic seizures in particular. Dr. Brooks offered his opinion that Claimant's conversion disorder—apparently like all personality disorders—was a learned behavioral response that could

13

be unlearned with treatment. In other words, Dr. Brooks believed the conversion disorder was amenable to treatment generally, but there was no evidence that Claimant's relevant symptoms had improved with any treatment she has received.

To use a different analogy, obesity is a condition that can generally be improved if proper steps are taken, which may include unlearning certain behaviors. Still, the SSA requires that an ALJ consider the functional effects of obesity; the functional effects cannot be simply disregarded because of the possibility of mitigation. *See, e.g.*, *[Sienkiewicz v. Barnhart](#)*, 409 F.3d 798, 803 (7th Cir. 2005). Perhaps that is because it is not a certainty that every obese person would be successful at losing weight, the same way it's hardly a given that every claimant with a mental impairment involving learned behavioral responses would be successful at unlearning those behaviors with proper treatment.

The ALJ noted that there was tension between Dr. Brooks's testimony and various statements from Claimant's treating providers:

> Dr. Johnson [Claimant's treating psychologist] acknowledged that the claimant's attending neurologist has indicated that the claimant has pseudo-seizures and that she has no control over these events (Ex. Ex. 39F, page 3). However, Dr. Brooks also stated that the conclusion that the claimant has no control is merely an opinion. There is no neurological or physical cause for these events and they are not life threatening. Rather, in his opinion, they are learned, attention-seeking behaviors that can be unlearned, particularly when family members are involved in treatment with encouragement to ignore the behavior. Dr. Brooks stressed that the claimant had not received the appropriate treatment for somatization disorder, which requires family counseling to understand the condition and the need to ignore the behavior in order to avoid reinforcing it.

[[Dkt. 7-2 at 24](#).] Dr. Brooks concluded that Claimant's disorder was amenable to treatment, but that she had not received the correct type of treatment for her disorder. That opinion sounds more like a credibility consideration than an assessment of the functional effects of the disorder established by the record.

The Seventh Circuit has held that "[i]n assessing credibility, infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment." *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008). In *Craft*, the court cited SSR 96-7p. *Id.* SSR 96-7p has since been rescinded by the SSA and superseded by SSR 16-3p, which was the effective ruling based on the timing of this case. SSR 16-3p (S.S.A. Oct. 25, 2017), 2017 WL 5180304, at *1. However, SSR 16-3p offers the same guidance:

> In contrast [to persistent attempts to treat symptoms], if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints.

*Id.* at *9.

Here, there is no indication that Claimant had failed to follow prescribed treatment. Dr. Brooks testified that Claimant should have received counseling involving "people that have significant relationships with the patient." [Dkt. 7-2 at 98.] However, there is no indication that therapy involving those people was ever recommended by a treating provider. Claimant's hearing representative asked Dr. Brooks, "In your review of the record, does it appear that the claimant is treatment compliant with the recommendations of her physicians?" [Dkt. 7-2 at 98.] Dr. Brooks responded, "Yes." [Dkt. 7-2 at 98.] The ALJ did not give any apparent consideration to the reason offered to explain Claimant not pursuing the specific type of treatment that Dr. Brooks thought could be beneficial.

15

The record does contain extensive evidence—alluded to above—of Claimant seeking treatment for her seizure symptoms, including with a psychologist, neurologists, vocational counseling, a primary care physician, and a mental health nurse practitioner. SSR 16-3p states that "[p]ersistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent." 2017 WL 5180304, at *9. A treating neurologist noted that Claimant had "started therapy with an IU Health neuropsychologist, Dr. Courtney Johnson, a specialist in conversion disorders." [Dkt. 7-23 at 59.] There is no indication that Claimant failed to follow the treatment recommendations of Dr. Johnson, who apparently specializes in the treatment of conversion disorder.

To be clear, the Court does not conclude—nor can it conclude within the standard of review—that the ALJ must find Claimant's statements concerning her subjective symptoms to be credible. The Seventh Circuit has held that a somatoform disorder does not necessarily imply that the claimant has exaggerated her symptoms and that disabling symptoms cannot be ignored simply because their cause is psychological rather than physical. *Carradine v. Barnhart*, 360 F.3d 751, 754-55 (7th Cir. 2004). However, the Seventh Circuit has held that an ALJ may properly conclude that the claimant has overstated her symptoms if such a conclusion is supported by the facts of the case, including evidence of her activities. *Simila v. Astrue*, 573 F.3d 503, 517-18 (7th Cir. 2009). Here, the ALJ did note that the evidence contained reference to Claimant continuing to drive. [Dkt. 7-2 at 28.] The ALJ concluded that the "fact that claimant would continue to drive at all is not consistent with her allegations." [Dkt. 7-2 at 28.] However, the Court is not able to conclude that the ALJ would have found Claimant to not be

credible based on this one consideration, absent the ignored opinion evidence, ignored supporting signs, misstated record, and the problematic adoption of Dr. Brooks's credibility determination.

The ALJ also explained that she gave "great evidentiary weight to the assessment offered by Dr. Brooks and [she adopted] the assessment as the claimant's mental residual functional capacity." [Dkt. 7-2 at 29.] However, the ALJ misstated Dr. Brooks's assessment by stating that:

> He concluded that the claimant retains adequate mental functional capacity to understand, remember and carry out most types of instructions, except those that are complex. Similarly, she is able to maintain attention and concentration on tasks that are not complex or have complex procedures. She is able to make necessary work-related judgments on those tasks.

[Dkt. 7-2 at 29.] Dr. Brooks's testimony was that Claimant's "ability to understand, remember, carry out simple *and complex* instructions [was] not limited." [Dkt. 7-2 at 92.] Dr. Brooks assessed Claimant's ability to sustain attention and concentration for two periods at a time to not be limited, and he did not limit her ability to make work-related judgments. [Dkt. 7-2 at 92.] Dr. Brooks did not limit any of Claimant's related abilities to handle even complex tasks. As mentioned above, Claimant reported that the effects of her psychogenic seizures could cause her to lose hours at a time. It appears that Dr. Brooks believed that Claimant would not have any limitations with attention or concentration because her reported symptoms may have been amenable to her receiving the correct type of treatment. Regardless, Dr. Brooks's assessment did not provide a basis for the ALJ's conclusion that Claimant would be limited in her ability to sustain complex tasks.

The Court also notes that despite Dr. Brooks assessing moderate limitations with Claimant's ability to adapt and maintain herself, Dr. Brooks did not offer any kind of

17

corresponding limitation when he was asked to assess her mental RFC. [*See* Dkt. 7-2 at 92-93.] Furthermore, the Seventh Circuit has explained that when a claimant's limitations are stress-related, the RFC should account for the level of stress that the claimant can handle. *Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019) (citing *Arnold v. Barnhart*, 473 F.3d 816, 820-23 (7th Cir. 2007); *Johansen v. Barnhart*, 314 F.3d 283, 285-89 (7th Cir. 2002)).

Accordingly, for all the reasons explained above, the Court concludes that the ALJ's RFC finding depended too heavily on the assessment of Dr. Brooks. On remand, the ALJ should give further consideration to **all of** the opinion evidence, Claimant's statements regarding her subjective symptoms, and her mental RFC in accord with the authorities detailed above and any other applicable authorities of the SSA.

## IV. <u>CONCLUSION</u>

For the reasons detailed herein, the Court **REVERSES** the ALJ's decision denying Claimant's benefits and **REMANDS** this matter for further proceedings pursuant to 42 U.S.C.§ 405(g) (sentence 4) as detailed above.

SO ORDERED.

Dated: 17 OCT 2019

 *[signature: Mark J. Dinsmore]*
 Mark J. Dinsmore
 United States Magistrate Judge
 Southern District of Indiana

Distribution:

Service will be made electronically on all
ECF-registered counsel of record via email
generated by the Court's ECF system.